UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| DORN BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:22-cv-00014-SEB-KMB |
| | ) | |
| CHEMTRUSION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Dkt. 50].  Plaintiff Dorn Bailey has brought this action against Defendant Chemtrusion, Inc. ("Chemtrusion") alleging that Chemtrusion violated the Americans with Disabilities Act (ADA) when it rescinded his job offer after learning during a pre-employment medical examination that he suffered from bilateral inguinal hernias.  For the reasons detailed below, we <u>GRANT</u> Defendant's motion.

## **Factual Background**

In January 2020, Mr. Bailey applied for a Production Operator position with Chemtrusion, a plastics processing company specializing in the manufacture of thermoplastic polymer compounds.  He sought to work in Chemtrusion's manufacturing facility in Jeffersonville, Indiana, which manufactures a compounded product for a single customer.  At all relevant times, Scott Owens was the President and CEO of Chemtrusion, and Karen Roe was the Administrative Manager of the Jeffersonville facility.  Dkt. 50-2 at 7; Dkt. 50-3 at 8, 12.

1

**Production Operator Position**

According to the written job description, a Production Operator produces "plastic compounds by configuring and operating production and blending equipment according to prescribed methods and criteria … prepar[es] blends, perform[s] material handling tasks, perform[s] line change over between grades, and assist[s] other production personnel to maintain plan housekeeping." Dkt. 50-4 at 1.  It is a physically demanding job that involves regular lifting and strenuous physical activity, including lifting 55-pound bags of raw materials up to approximately chest height and transferring the materials from the bag into a feeder system several times a shift, climbing on ladders, and regularly assembling and disassembling 35-pound boxes.  Given these tasks, the job description provides that an employee is required, *inter alia*, to walk, sit, climb, balance, kneel, crouch, crawl, and stoop, as well as frequently lift items up to 55 pounds from floor to above shoulder height and to use devices that require a pushing or pulling force of up to 120 pounds.  Dkts. 50-4 at 2; 50-5 at 24, 29.

**Defendant's Pre-Employment Medical Examinations**

Because of the physical demands of its work, Chemtrusion conducts medical examinations of its potential employees after they have been given conditional job offers. Dkt. 50-5 at 22, 23.  At all times relevant to this litigation, Chemtrusion used Baptist Health Occupational Medicine ("BHOM") to conduct the medical examinations of its candidates.  Dkt. 50-6 at 30.  BHOM regularly performs pre-employment medical examinations for various businesses.  *Id.* at 15.  To prepare for these examinations, BHOM staff members review Chemtrusion's written job description for the relevant

position and tour the Jacksonville facility to observe the tasks required to be performed in an effort to better understand the physical requirements set forth in the job description. Dkt. 50-2 at 46; Dkt. 50-6 at 19.

Each candidate's medical examination begins with visual acuity testing and color screening, after which the candidate is given a baseline hearing screening and has their vitals taken. Dkt. 50-6 at 32, 33. The candidate is then placed in an examination room where a certified physician's assistant ("PA") conducts the remainder of the exam. *Id.* at 33. The PA typically begins by reviewing the individual's medical history and explaining that the purpose of the exam is the ensure that the candidate has no medical conditions that would interfere with their ability to safely perform the required work. *Id.* at 33–34. Next, the PA conducts a general survey of the patient for any physical abnormalities, including the head, ears, chest, lungs, abdomen, neck and spine, and upper and lower extremities. *Id.* at 34–36. The PA also observes as the candidate performs various physical tasks to check for balance, neurological, or other related issues. *Id.* at 36–37. Finally, if the candidate is male,[1] the PA assesses potential "inguinal hernias in the inguinal region of the pelvis." *Id.* at 37. As part of this examination, the PA runs a finger along the "inguinal canal" to "feel the inguinal ring," which is a "muscle ring of the abdomen just above the scrotal area." *Id.* The PA then instructs the candidate to "turn their head and cough" on each side so the examiner can "feel or see a bulge" that would

---

[1] Due to unique aspects of the male anatomy, this portion of the exam is conducted only on men. Dkt. 50-6 at 37.

indicate an "inguinal hernia," which occurs when the small intestines, the lower intestines, or the colon push through the inguinal ring into the scrotum.  *Id.* at 37, 51.

Upon completion of the examination, each candidate is told that they will be contacted by Chemtrusion regarding the results of the examination.  *Id.* at 38.  BHOM provides its medical opinions to Chemtrusion regarding whether a candidate is physically able to perform the duties associated with a position and whether they have any medical restrictions or a need for additional accommodations, and Chemtrusion, not BHOM makes the determination as to whether a candidate should be hired.  Dkt. 50-1 ¶ 15; Dkt. 50-6 at 62.

**Plaintiff Receives Conditional Job Offer**

Mr. Bailey interviewed for an open Production Operator position in January 2020. During the interview process, Mr. Bailey had an opportunity to walk through the Jeffersonville plant.  While touring the facility, he observed a Chemtrusion employee "who was actually doing the job" of Production Operator (Dkt. 50-7 at 38) as the employee performed various physical tasks, including lifting 55-pound bags of chemicals two to three feet off the floor and pouring the chemicals in a blender bucket and also using shovels to move product.  *Id.* at 38, 40–41, 43, 50.

In addition to the interview, Mr. Bailey completed a background check as well as mental tests evaluating his math, reading, and measurements comprehension.  On January 20, 2020, Chemtrusion extended a conditional employment offer to Mr. Bailey, which he accepted.  The job offer was made conditional subject to his successful completion of a drug screen and the physical examination, which were scheduled for January 29, 2020.

**Plaintiff's Medical Examination**

Chemtrusion referred Mr. Bailey to BHOM's clinic to undergo the required physical examination, which was performed by John Dougherty.  Mr. Dougherty is a PA certified by the National Commission of Physician Assistants and is also certified by the Federal Motor Carrier Safety Administration as a medical examiner.  He is licensed to practice medicine as a PA in Indiana and Kentucky and regularly provides pre-employment, post-offer physical examinations.  Dkt. 50-6 at 9, 12, 15.

Prior to his examination of Mr. Bailey, Mr. Dougherty reviewed the Production Operator job description and toured the Jeffersonville facility himself to observe many of the tasks involved with performing the Production Operator duties.  Mr. Dougherty understood that Production Operators handle "very large-bundled bags … of at least 50 pounds or more" and are expected to lift "those materials into various machines that they use to process raw materials," often "from the floor to … above shoulder height."  Dkt. 50-6 at 24–25.

Mr. Bailey provided his medical history as part of the physical examination and shared that he had had hernias for at least ten years.  Although Mr. Dougherty testified that he did not remember Mr. Bailey's sharing that information prior to the exam, Mr. Dougherty determined upon examination that Mr. Bailey did in fact have "bilateral inguinal hernias."  *Id.* at 49, 50.  Mr. Dougherty observed in Mr. Bailey's case that "it was obvious that there was a mass on both sides" of his body, which masses were "visible and palpable" and each about "the size of a golf ball."  *Id.* at 51–52; Dkt. 50-10 at 22.  Apart from the hernias, Mr. Dougherty noted no other concerns about Mr. Bailey's medical

condition and, as he testified by deposition, he deemed Mr. Bailey otherwise "very healthy." Dkt. 50-6 at 49. Mr. Dougherty did not evaluate Mr. Bailey's ability to lift up to 55 pounds or push/pull up to 120 pounds during the medical examination. Dkt. 50-7 at 69, 186.

After discovering the inguinal hernias, Mr. Dougherty advised Mr. Bailey that there was a risk of the hernias worsening with physical activity, particularly with heavy lifting, and that he should contact his primary medical provider to determine what next steps needed to be taken. Dkt. 50-6 at 68–69. According to Mr. Bailey, Mr. Dougherty directed him to go to the nearest hospital, the University of Louisville Hospital (the "UL Hospital"), to be examined/treated regarding the hernias. Dkt. 50-7 at 71–72. To document this conversation, Mr. Dougherty provided a written note to Mr. Bailey that stated as follows: "You [have] inguinal hernias on both sides. You need to be seen by a general surgeon. Surgical repair would be required, if you are to be release[d] to work without any lifting restrictions. Until then, you should not lift/push/pull more than 25 pounds." Dkt. 77 at 17. Both Mr. Dougherty and Mr. Bailey signed the note. *See id.*

Following Mr. Bailey's examination, Mr. Dougherty sent Chemtrusion an examination form indicating that Mr. Bailey had the following restriction: "No lifting/pushing/pulling > 25 lbs." Dkt. 77 at 8. Mr. Dougherty also contacted Chemtrusion's Administrative Manager Karen Roe by phone to report his findings, informing Ms. Roe that Mr. Bailey "had a condition that would limit his lifting [and] that would put him in danger of injuring himself at work if he did perform heavy lifting." Dkt. 50-6 at 69. Mr. Dougherty reiterated that if Mr. Bailey were hired as a Production

6

Operator, his duties "should not involve any lifting, pushing, or pulling greater than 25 pounds." Dkt. 50-6 at 69; *see also* Dkt. 50-3 at 23.

Mr. Daugherty testified that he had been concerned that the frequent, heavy lifting required in the Production Operator position would "either lead to worsening of the herniation where it would need repair or even [a] strangulation event," which occurs when the herniated tissue is "incarcerated" or stuck through the inguinal ring, causing "acute onset pain" that results in a medical emergency. Dkt. 50-6 at 54–55. If strangulation occurs and "the patient does not seek prompt medical attention, it could lead to sepsis and even ultimately death." *Id.* Although the hernias would not "necessarily affect [one's] ability to lift," lifting heavy objects "several times a day … could lead to further damage to [the] inguinal ring, [and] thus enlargement of the hernia." *Id.* at 57.

According to Mr. Dougherty, there was "no way to predict" whether or when enlargement of the hernia or strangulation would actually occur, and, although incarceration and strangulation are rare complications that he had not personally encountered over his "20-some-odd years of doing this," he believed that it "would be inappropriate" for him to disregard the risk. *Id.* at 54, 63–64. Regarding the possibility of a lesser harm, Mr. Dougherty testified that inguinal hernias "commonly occur and are painful and ultimately require surgery so that they don't become an issue in the future." *Id.* at 58. He said he sees approximately two to five cases per year of inguinal hernias that require surgery to repair. *Id.* at 59. In addition to the health risks associated with hernias, Mr. Dougherty also testified that hernias lead to an increased risk of worker's

7

compensation claims for the employer.  *Id.* at 55–56, 58.  Without repair of the hernia, Mr. Bailey's condition is permanent.  *Id.* at 62.

Mr. Dougherty further testified that the risks associated with inguinal hernias were "ingrained in [him] early in [his] career in occupational medicine," specifically in 1999, when his first supervising physician at BHOM emphasized that such untreated hernias "could lead to harm to a candidate as well as potential compensability and liability of the employer."  Dkt. 50-6 at 87.  This warning about inguinal hernias "kind of stuck in [Mr. Dougherty's] brain since 1999 as being one of the important things" to assess in occupational medicine.  *Id.* at 58.

**Plaintiff's Examination at the UL Hospital**

Directly following his physical examination by Mr. Dougherty, Mr. Bailey went to the UL Hospital emergency department to have his hernias examined.  Mr. Bailey told the emergency department doctor that he needed "[t]o be cleared to lift, push, and pull the weight," (Dkt. 50-7 at 80–81); specifically, that he needed to be cleared to "push, pick up 55 pounds, be able to push and pull 130 pounds."  Dkt. 50-7 at 82–83.  According to Mr. Bailey, he told the doctor "the numbers" that he needed to lift but did not inform the doctor of the height to which he would need to lift the weight, the frequency at which he would be required to lift the weight, nor did he provide the doctor with a copy of the written job description for the Production Operator position.  *Id.* at 14, 82–83.

Upon leaving the emergency department, Mr. Bailey returned to the BHOM office and provided Mr. Dougherty with a copy of page "2 of 11" of the discharge report he had received from the UL Hospital emergency department, which stated as follows:

> Please follow-up with elective surgery clinic.  No lifting restrictions at this time but please be cautious as hernia can get larger with abrupt twisting motions.  Please return to the ER if your hernia becomes painful, you are unable to push it back in, or it gets hard or for any other concerning symptoms.

Dkt. 77 at 16.  This single page of the discharge report was neither signed nor dated, and, while Mr. Dougherty reviewed it and included it with Mr. Bailey's medical records, its finding did not change his medical opinion.  Mr. Dougherty told Mr. Bailey that he needed to be seen and cleared by a surgeon.  Dkt. 50-7 at 92.  Mr. Dougherty called Ms. Roe, informed her of Mr. Bailey's visit to the UL Hospital's emergency department, and stated that he still had concerns about Mr. Bailey's hernias.

After Mr. Bailey provided Mr. Dougherty the discharge report, he visited Ms. Roe's office to provide a copy of the same page of the report to her.  Ms. Roe told Mr. Bailey that she would have to review the paperwork and consult with Mr. Dougherty, after which she would get back in touch with him.  Dkt. 50-3 at 26–27; Dkt. 50-8 at 1.

**Defendant Rescinds Plaintiff's Conditional Job Offer**

After speaking with Mr. Dougherty and reviewing the information regarding Mr. Bailey's follow-up visit at UL Hospital's emergency department, Ms. Roe consulted with legal counsel and Chemtrusion's President and CEO, Scott Owens, regarding Mr. Bailey's ability to perform the Production Operator position.  Dkt. 50-2 at 12; Dkt. 50-3 at 27–29.  Ms. Roe spoke with Mr. Owens by phone and informed him that Mr. Bailey had "restrictions in his ability to perform the role of Production Operator" and was "unable to perform the essential functions of the Production Operator position."  Dkt. 50-2 at 13, 16–17.  Mr. Owens agreed that, because of the lifting restrictions related to the hernia,

Mr. Bailey could not perform the essential functions of the Production Operator position. Ms. Roe and Mr. Owens both testified that, in reaching this decision, they relied on the professional medical opinion provided by Mr. Dougherty that he was "quite concerned" about the hernias and the "risk for [Mr. Bailey] to attempt to perform the job responsibilities based upon the job description."  Dkt. 50-3 at 28, 43, 46; Dkt. 50-2 at 41–42.

Chemtrusion has on prior occasions provided certain accommodations for Production Operators, including temporary lifting restrictions to accommodate temporary medical conditions.  However, the company has never provided a permanent lifting restriction as an accommodation for any Production Operator,[2] because, if such a permanent restriction were permitted, Chemtrusion would need to hire additional personnel to perform the frequent heavy lifting required in the position.  Dkt. 50-3 at 35–37, 39–40.  Nor did Mr. Owens and Ms. Roe believe there was any other open position that Mr. Bailey could perform, given the lifting restrictions Mr. Dougherty had imposed. Although Chemtrusion maintained some laboratory positions for testing products that were less physically demanding than the Production Operator position, none of those lab positions was open during the period when Mr. Bailey had a conditional offer of employment, and, in any event, those lab positions also required lifting "up to 50 pounds."  Dkt. 50-6 at 29–30.

---

[2] Chemtrusion has offered certain other permanent accommodations for Production Operators, including allowing employees with diabetes to take frequent breaks for blood sugar testing, insulin injections, and recovery, and providing other permanent accommodations for employees with visual impairment and color blindness.  Dkt. 50-2 at 24–26; Dkt. 50-3 at 44–45.

According to Mr. Owens, based on the above-recited considerations, he determined that Chemtrusion needed to rescind Mr. Bailey's conditional job offer.  On February 3, 2020, Ms. Roe contacted Mr. Bailey by phone to inform him that Chemtrusion could not continue with his hiring process because he was unable to perform the essential functions of the position, but that, "if his condition changed, he could reapply."  Dkt. 50-3 at 28; Dkt. 50-8 at 2.  Ms. Roe indicated that she would follow up this call with a formal letter rescinding the offer.  Dkt. 50-8 at 2.

**Plaintiff's Examination by UL Hospital Surgeon**

On February 4, 2020, the day after being notified that Chemtrusion's job offer had been rescinded, Mr. Bailey consulted Dr. Frank Wood, a surgical specialist at the UL Hospital.[3]  According to Mr. Bailey, he explained the Production Operator position to Dr. Wood and provided him a copy of the job description.  Dkt. 50-7 at 94.  Dr. Wood conducted a physical examination of Mr. Bailey, on the basis of which he provided Mr. Bailey with a note, stating: "This note serves as verification that Dorn Bailey was at ULP Clinic today, to see Dr. Wood, and may return to work on 2-4-2020, with the following restrictions: NONE."  Dkt. 77 at 9–10.  Dr. Wood also completed an "Initial Evaluation" form after examining Mr. Bailey, noting that Mr. Bailey had "[b]ilateral inguinal hernias not involving scrotum, palpable buldge [sic] bilaterally, reducible" and that Mr. Bailey was "ok to start work at new job" with the "only risk" being that the "hernias could

---

[3] The parties dispute whether Dr. Wood's report is admissible.  Because we find for the reasons detailed below that Chemtrusion is entitled to summary judgment, even considering Dr. Wood's report, we err on the side of Mr. Bailey and presume its admissibility for the purposes of deciding the instant motion.

11

enlarge and become more bothersome." *Id.* at 11.  The "Initial Evaluation" also noted that Mr. Bailey was "willing to wear hernia truss at work to assist with support." *Id.*

Mr. Bailey submitted Dr. Wood's note and Initial Evaluation to Mr. Dougherty on February 5 and February 6, 2020, respectively.  Mr. Dougherty reviewed these materials, but his opinion remained unchanged—that, given the physical demands of the Production Operator position, Mr. Bailey needed to have lifting restrictions to prevent the risk of the hernias worsening.  Dkt. 50-6 at 84.  According to Mr. Dougherty, despite Dr. Wood's release, Mr. Bailey's hernias "still present[ed] a risk of incarceration/strangulation until fixed, in the presence of lifting activities associated [with] the Chemtrusion position";  thus, Mr. Dougherty's opinion remained that Mr. Bailey would need lifting restrictions "until successful repair [of the hernias] and subsequent release by [a] surgeon."  Dkt. 77 at 9.

Mr. Bailey attempted to contact Chemtrusion following his examination by Dr. Wood, but did not receive a return call.  Dkt. 50-7 at 101–02.  Ms. Roe was never provided Dr. Wood's note or his Initial Evaluation of Mr. Bailey.  The only information she received from the UL Hospital was Mr. Bailey's discharge paperwork from the emergency department.  On February 6, 2020, Ms. Roe sent a letter to Mr. Bailey formally notifying him of Chemtrusion's decision to rescind his job offer.

Approximately two months later, in April 2020, for reasons not explained to the Court, Chemtrusion reoffered the Production Operator position to Mr. Bailey.  He declined the offer, however, because he was told he would eventually still need to get the hernia repaired.  Dkt. 50-7 at 174.

**The Instant Litigation**

Nearly two years thereafter, on February 1, 2022, Mr. Bailey filed his complaint in this litigation, alleging that Chemtrusion had discriminated against him by rescinding his job offer because it regarded him as disabled and by failing to accommodate and/or engage in any good-faith interactions regarding whether an accommodation was necessary, in violation of his rights protected by the ADA.  Now before the Court is Chemtrusion's motion for summary judgment on Mr. Bailey's claims, which motion is fully briefed and ripe for ruling.

## Legal Analysis

### I.        Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

### II.        Discrimination Claim

13

Mr. Bailey contends that Chemtrusion discriminated against him in violation of the ADA when it rescinded its conditional job offer. Under the ADA, an employer cannot discriminate against a qualified individual on the basis of his disability with regard to the job application and hiring process. 42 U.S.C. § 12112(a). To establish a claim of disability discrimination under the ADA, a plaintiff must prove that: (1) he is disabled as defined by the ADA; (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) he has suffered an adverse employment action because of his disability. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013). The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment…." 42 U.S.C. § 12102(1).

## A.   Disabled as Defined by the ADA

There appears to be no dispute, at least for purposes of this motion, that Mr. Bailey was "regarded as" disabled by Chemtrusion, given Chemtrusion's explanation that it rescinded its conditional job offer to him based on its belief that performing the frequent heavy lifting required in the Production Operator position would pose a risk to his own safety. *Se. E.E.O.C. v. Amstead Rail Co.*, 280 F. Supp. 3d 1141, 1150–51 (S.D. Ill. 2017) ("It is enough under the 'regarded as' prong to show that an employer failed to hire an applicant because it believed, rightly or wrongly, that he would be a safety risk.") (citing 29 C.F.R. pt. 1630, App. § 1630.2(l) (2016)). Chemtrusion has put forth no other explanation. Accordingly, the issues before the Court are whether Mr. Bailey was

14

qualified to perform the essential functions of the Production Operator position, either with or without reasonable accommodation, and whether he suffered an adverse employment decision "because of" his disability.

### B.   Qualified Individual

We turn first to address whether Mr. Bailey has shown that he was a "qualified individual" under the ADA, which is the primary focus of the parties' dispute here.  An individual is "qualified" under the ADA if he, "with or without reasonable accommodation can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  Chemtrusion argues that Mr. Bailey was not a qualified individual because at the time it rescinded his conditional job offer, it had reasonably determined that, due to the 25-pound lifting restriction imposed by Mr. Dougherty following the standard, post-offer/pre-employment medical exam required of all Production Operator candidates, Mr. Bailey was unable to perform the essential functions of the Production Operator position, specifically, the lifting requirements, which included frequently lifting up to 55 pounds from floor level to above shoulder height and using devices that require a pushing or pulling force of up to 120 pounds.

Mr. Bailey does not dispute that such lifting was an essential function of the Production Operator position,[4] but argues that Mr. Dougherty never determined that he was in fact unable to lift the amount of weight required.  Instead, he claims that Mr.

---

[4] The record likewise supports a finding that these lifting requirements are essential functions of the Production Operator position as they were included in the position's written job description and various Chemtrusion employees and Mr. Bailey himself have recounted their personal observations that such lifting tasks were regularly performed by Production Operators.

Dougherty simply speculated that, because of his hernias, he would be unable to safely lift more than 25 pounds, which determination was based not on an individualized assessment of his abilities, but on generalized and outdated medical knowledge about the risks associated with untreated hernias.  Therefore, Mr. Bailey contends, it was unreasonable for Chemtrusion to rely upon Mr. Dougherty's medical opinion when it rescinded his offer of employment.

   It is undisputed that Mr. Dougherty never did actually assess Mr. Bailey's ability to lift 55 pounds or push/pull 120 pounds on a one-time basis during the medical exam.  Mr. Dougherty did opine that hernias would not "necessarily affect [one's] ability to lift, but upon lifting those objects, especially if they did it several times a day, that could lead to further damage to that inguinal ring, thus enlargement of the hernia" or to other medical conditions, such as incarceration or strangulation of the hernia, which in his view were serious medical emergencies.  Dkt. 50-6 at 55–57; Dkt. 53 at 9.  Considering the frequent heavy lifting required of Chemtrusion's Production Operators, Mr. Dougherty concluded that the risk of serious complications with Mr. Bailey's existing bilateral hernias was too great to ignore and would, indeed, prevent him from safely performing the essential functions of the position on a daily basis.  Chemtrusion argues that it was entitled to rely on Mr. Dougherty's medical opinion that Mr. Bailey was restricted to lifting no more than 25 pounds in determining whether Mr. Bailey was able to perform the essential functions of the Production Operator position with or without accommodation.

   "At summary judgment, it is the plaintiff's burden to provide evidence such that a rational jury could find [him] to be a qualified individual, meaning the plaintiff is one

who can perform the essential functions of the employment position either with or without reasonable accommodation." *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 968 (7th Cir. 2020) (internal quotation marks and citations omitted). The determination whether an individual is qualified must be made on the basis of his "capabilities at the time of the employment decision." *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1059 (7th Cir. 1998). Thus, Mr. Bailey must establish that, at the time Chemtrusion revoked his job offer, he could perform the essential functions of the Production Operator position, namely, the frequent, heavy lifting, with or without accommodation.

Under Seventh Circuit law, "[o]nce an employee is evaluated by a doctor, an 'employer is entitled to rely on a physician's recommendation that the employee is not able to safely perform an essential function of his job,'" *McCallister*, 983 F.3d at 968 (quoting *Stern v. Anthony's Health Ctr.*, 788 F.3d 276, 294 (7th Cir. 2015)), so long as "the medical opinion was reached after a doctor performed an individualized examination of the employee" and the employer's reliance is "reasonable, in good faith, and not the product of collusion to disqualify an applicant." *E.E.O.C. v. Amstead Rail Co.*, 280 F. Supp. 3d 1141, 1156 (S.D. Ill. 2017) (citing *Stern*, 788 F.3d at 282; *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 975 (7th Cir. 2000)). However, where a "medical opinion is 'unsubstantiated and cursory' and 'neither based on the individualized inquiry mandated by the ADA nor supported by objective scientific and medical evidence,' an employer cannot rely on it to make employment decisions." *Amstead Rail Co.*, 280 F. Supp. 3d 1156 (citing *Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000)).

Here, there is no allegation that Chemtrusion acted in bad faith or colluded with Mr. Dougherty to disqualify Mr. Bailey.  Rather, Mr. Bailey argues that Chemtrusion's reliance on Mr. Dougherty's medical opinion was unreasonable because Mr. Dougherty failed to conduct an individualized assessment of Mr. Bailey's actual ability to perform the essential functions of the Production Operator position, relying instead on speculative, generalized information regarding how untreated hernias usually affect individuals, all while ignoring the reports from the UL Hospital emergency room doctor and Dr. Wood that rebutted his conclusion.  For the following reasons, we disagree with this analysis.

In reaching his opinion, Mr. Dougherty relied on his physical examination of Mr. Bailey, including his observations regarding the size and location of Mr. Bailey's hernias; his professional knowledge of the risks associated with heavy lifting and untreated inguinal hernias; the lifting requirements as defined in the Production Operator position's written job description; his personal observations of the intensity and frequency of the lifting tasks performed by Production Operators following his tour of Chemtrusion's Jeffersonville facility; and the UL Hospital emergency room report and the report from the UL Hospital surgeon, Dr. Wood.  All of this evidence provides an appropriate basis on which to form an opinion pursuant to the ADA and its regulations.

In considering this information, Mr. Dougherty gleaned several facts substantiating his having performed an individualized assessment of Mr. Bailey's condition, including the location of the hernias—Mr. Dougherty testified that inguinal hernias in particular are exacerbated by heavy lifting (Dkt. 50-7 at 55); the size and

18

number of hernias—bilateral and golf ball-sized; and the specific nature of the heavy

lifting—to wit, that it was not simply that Mr. Bailey would occasionally be required to

lift a heavy object, but that the Production Operator position required frequent, repetitive

lifting of heavy objects to chest level and above.  Mr. Dougherty's imposition of the

lifting restriction was therefore based not simply on the general fact that hernias can be

exacerbated by physical activity, but on the specific size, type, and location of Mr.

Bailey's existing hernias as well as Mr. Dougherty's personal observations of the exact

demands of the position Mr. Bailey was seeking to perform.  This is sufficient to

constitute an individualized assessment under the ADA and its regulations.

The only evidence provided to Chemtrusion contradicting Mr. Dougherty's opinion

was the exception from the UL Hospital emergency room discharge form that indicated

that Mr. Bailey could work without lifting restrictions.  Though the surgeon, Dr. Wood,

rendered a similar opinion, it is undisputed that Chemtrusion was unaware of his report at

the time it revoked Mr. Bailey's job offer.  Importantly, despite imposing no lifting

restrictions, both Dr. Wood and the UL Hospital emergency room report cautioned that

Mr. Bailey's hernias could worsen and enlarge, particularly with certain types of physical

exertion, which aligned with Mr. Dougherty's concerns regarding Mr. Bailey's ability to

safely perform the regular heavy lifting required of Chemtrusion's Production Operators.

Because the emergency room report was unsigned, it was unclear to Mr. Dougherty who

had actually examined Mr. Bailey.  Given that Mr. Dougherty had no indication that

either medical provider was specifically aware of the strenuous nature of the Production

Operator position and the precise duties Mr. Bailey would be required to perform, we find

both that it was within Mr. Dougherty's reasonable medical judgment to accord lesser weight to those reports and that Chemtrusion's reliance on Mr. Dougherty's opinion in this regard was not unreasonable.[5]  Because Chemtrusion was entitled to rely on Mr. Dougherty's medical judgment that Mr. Bailey was restricted from lifting more than 25 pounds, the undisputed facts establish that Mr. Bailey was not qualified to perform the essential functions of the Production Operator position without accommodation.

Mr. Bailey has also failed to establish that there was any reasonable accommodation that would have allowed him to perform the regular, heavy lifting required in the Production Operator position. Mr. Bailey's only contention here is that Chemtrusion should have considered whether the use of a hernia truss would allow him to safely perform the required lifting.  Putting aside that the fact that Mr. Bailey never requested permission to use a hernia truss as an accommodation and Chemtrusion was never provided Dr. Wood's report referencing such a device, Mr. Bailey has failed to present any evidence regarding hernia trusses and how wearing one would have assisted him in performing the essential functions of the Production Operator position.

---

[5] In any event, Chemtrusion first informed Mr. Bailey of its decision to revoke his job offer the day *before* Mr. Bailey saw the surgeon, Dr. Wood, so that report could not have factored into the company's decision.  Although Mr. Bailey contends that he attempted to provide that report to Chemtrusion between the time he was verbally notified that his job offer was being revoked and when he received written confirmation of that decision, it is undisputed that Chemtrusion was unaware of the surgeon's opinion until *after* it had revoked Mr. Bailey's job offer.  This is important because an employee's ability to perform the essential functions of his job "is examined as of the time of the adverse employment decision at issue," *Basden v. Prof. Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013), and here, at the time the decision was made, Chemtrusion had before it only Mr. Dougherty's opinion and the emergency room report in determining whether Mr. Bailey could safely perform the essential functions of the Production Operator position.

For these reasons, Mr. Bailey has failed to create a genuine issue of material fact
to survive summary judgment establishing that he could perform the essential functions
of the Production Operator position, even with accommodations.  Accordingly, Mr.
Bailey is not a qualified individual under the ADA.

### III.    Failure to Accommodate Claim

We turn finally to Mr. Bailey's failure-to-accommodate claim under the ADA.  As
discussed above, the ADA prohibits employers from "discriminat[ing] against a qualified
individual on the basis of disability …."  42 U.S.C. § 12112(a).  To comply with this
provision, employers must "mak[e] reasonable accommodations to the known physical or
mental limitations of an otherwise qualified individual with a disability who is an
applicant or employee" unless doing so "would impose an undue hardship on the
operation of [the employer's] business…."  42 U.S.C. § 12112(b)(5)(A).  To prevail on
such a claim, a plaintiff must show (1) that he "is a qualified individual with a disability;"
(2) that the defendant-employer "was aware of [his] disability;" and (3) that the
defendant-employer "failed to reasonably accommodate the disability." *Kotwica v. Rose
Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011) (internal quotations omitted).

Because we have found based on the reasons detailed above that Mr. Bailey has
failed to establish that he is a qualified individual under the ADA, his failure-to-
accommodate claim necessarily fails on those same grounds.  Additionally, Mr. Bailey
has proceeded in this litigation only under a "regarded as" theory of disability.  His
failure-to-accommodate claim therefore also fails because "the ADA does not require
employers to provide reasonable accommodations to those regarded as having a

disability." *Grindling v. Cathay Pac. Airways, Ltd.*, No. 23 C 5030, 2024 WL 4164234, at *4 n.3 (N.D. Ill. Sept. 11, 2024) (citing *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 n.4 (7th Cir. 2013) ("The amendments to the ADA clarified that employers needn't provide reasonable accommodation to a 'regarded as' disabled individual."); *see also* 42 U.S.C. § 12201(h).  Accordingly, Chemtrusion is entitled to summary judgment on this claim.

## IV.   Conclusion

For the reasons detailed above, we <u>GRANT</u> Defendant's Motion for Summary Judgment [Dkt. 50].  Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date:   _____9/30/2024_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Robin C. Clay
CURLIN & CLAY LAW
rclay@curlinclaylaw.com

Alexander Phillip Will
Frost Brown Todd LLP
awill@fbtlaw.com